UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OTIS COWART, JR., LARRY BLATT, and
ALFRED POWELL,

                               Plaintiffs,

      - against -

PAUL ARTETA, Individually and In His Official
Capacity as Orange County Sheriff, ORANGE
COUNTY SHERIFF'S OFFICE, and COUNTY OF
ORANGE,

                               Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 23-CV-9412 (CS)

Appearances:

Jonathan R. Goldman
Goldman Law, PLLC
Newburgh, New York
*Counsel for Plaintiffs*

Annemarie Jones
Blair J. Hendricks
Sokoloff Stern, LLP
Carle Place, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is Defendants' motion for summary judgment. (ECF No. 40.) For the

following reasons, the motion is GRANTED.

## I.    **BACKGROUND**

The following facts are based on Defendants' Local Civil Rule ("LR") 56.1 Statement,

(ECF No. 43 ("Ds' 56.1 Stmt.")), Plaintiffs' responsive LR 56.1 Statement, (ECF No. 49 ("Ps'

56.1 Resp.")), and the supporting exhibits, and are undisputed unless otherwise noted.[1]

### A.    **Facts**

On January 1, 2023, Plaintiffs Otis Cowart, Jr., Larry Blatt and Alfred Powell were

terminated from their positions as Program Integrity Officers ("PIO"s) with the Orange County

Sheriff's Office ("OCSO").  (Ds' 56.1 Stmt. ¶¶ 7, 173.)  The PIO position entails "ensur[ing]

compliance with established police and corrections professional standards and . . . conduct[ing]

officer integrity checks and internal investigations into allegations of officer corruption and/or

misconduct."  (ECF No. 41-6 ("PIO Job Description") at 1; *see* Ds' 56.1 Stmt. ¶ 16.)  The job

duties of a PIO include "[i]nterview[ing] witnesses and targets of internal investigations,"

"[r]eview[ing] office policies and forms and ensur[ing] compliance with established professional

police and corrections professional standards," "[m]aintain[ing] working relationships with

Sheriff and Corrections command staff and other agencies," and "[c]omplet[ing] special

assignments as directed," all under the supervision of the Sheriff and Undersheriff.  (PIO Job

---

[1] Along with their response to Defendants' 56.1 statement, Plaintiffs submitted a "counterstatement" of additional facts that they apparently believe are helpful to their case.  (*See* Ps' 56.1 Resp. at 32-37 ("Ps' Counterstmt.").)  LR 56.1 allows a party, "if necessary," to include "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute."  *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020).  Despite the impropriety of Plaintiffs' submission, I have considered it and Defendants' responses thereto, (ECF No. 51).

Description at 1-2; *see* Ds' 56.1 Stmt. ¶ 16.)  In carrying out these tasks, PIOs are required to act "in accordance with established office policies" but are afforded "wide latitude for independent judgment."  (PIO Job Description at 1; Ds' 56.1 Stmt. ¶ 20.)  The requirements for the position include "[t]horough knowledge of the methods employed in conducting internal investigations," "thorough knowledge of established police and corrections professional standards," and "ability to plan and carry out effective internal investigations," and applicants are required to have significant experience "in an investigative capacity with a law enforcement agency as a police officer," as well as "certification to serve as a Police Officer."  (PIO Job Description at 2; Ds' 56.1 Stmt. ¶¶ 26, 28-29.)

The idea for the PIO position originated with Carl DuBois and Kenneth T. Jones, who served as the OCSO Sheriff and Undersheriff, respectively, from January 2003 to January 2023. (Ds' 56.1 Stmt. ¶¶ 5-12.)  Because there was doubt as to the integrity of the prior administration, (*see* ECF No. 41-4 ("Jones Depo.") at 57:17-58:17), DuBois and Jones advocated for the creation of the PIO role as one of their initiatives when running for office, (Ds' 56.1 Stmt. ¶ 9). Jones recommended that the position be exempt from the civil service examination, as PIOs would play a "critical role in the implementation of any elected Sheriff's public policies," (ECF No. 41-7), and non-competitive status provided greater "latitude to terminate" PIOs who "undermine the program," (Jones Depo. at 56:22-61:20; *see* Ds' 56.1 Stmt. ¶¶ 21-22.)

Plaintiff Otis Cowart heard of the PIO position through Jones, as the two had become friends while working together at the New York State Police before Jones began working at the OCSO.  (Ds' 56.1 Stmt. ¶¶ 36-38, 40.)  Jones interviewed and hired Cowart for the PIO position in 2014, and upon being hired, Cowart was given the in-house rank of "technical captain" to enable him to investigate other commissioned officers from a command position.  (*Id.* ¶¶ 41, 43,

89; Jones Depo. at 103:6-14.)  In his role as technical captain, Cowart was an administrator of PIO responsibilities, oversaw paperwork from other staff members, attended nearly all command staff meetings, and coordinated with other agencies on behalf of the Sheriff and Undersheriff. (Ds' 56.1 Stmt. ¶¶ 91-94.)

In 2015, Cowart informed Plaintiff Alfred Powell about an open PIO position.  (*Id.* ¶ 54.) Cowart and Powell had developed a close friendship while working for the State Police – they speak on the phone multiple times per week, and they are godfathers to each other's children. (*Id.* ¶¶ 50, 53.)  Jones was aware of Cowart and Powell's friendship, and although they were not as close, Jones was friends with Powell as well.  (*Id.* ¶¶ 51, 80-81.)  Powell had recently been issued a letter of censure and notice of suspension by the State Police for misplacing his department-issued firearm and obstructing the resulting investigation.  (*Id.* ¶¶ 57-64; ECF No. 41-10.)  When Powell was directed to turn over his personal firearm due to his impending suspension, he reported that he could not locate it, prompting another investigation that ultimately culminated in Powell's decision to retire.  (Ds' 56.1 Stmt. ¶¶ 66-70.)  Although Cowart and Jones were both aware of Powell's misconduct and the investigations against him, Jones decided to hire Powell over the five or six other candidates he interviewed for the open PIO position.  (*Id.* ¶¶ 55, 73-74, 78.)  Plaintiff Larry Blatt also learned of the PIO position through Cowart, with whom he golfed several times per week.  (*Id.* ¶¶ 83, 86.)  Jones interviewed and hired Blatt in 2015.  (*Id.* ¶¶ 87, 118.)

In 2020, Defendant Paul Arteta, then a Captain in the OCSO, announced his intent to run for Sheriff in the upcoming election cycle.  (*Id.* ¶ 125.)  When Jones announced that he would run against Arteta, Cowart, Powell and Blatt all supported Jones's candidacy.  (*Id.* ¶ 128.)  Arteta was ultimately elected Sheriff in November 2022.  (*Id.* ¶¶ 129-131.)  He took office on January

1, 2023, and he terminated Plaintiffs' employment effective that same day.  (*Id.* ¶¶ 132, 173.)[2]  In the termination letters, the only reason Arteta gave was that he was "bringing in [his] own team as he commence[d] [his] new administration."  (*See* ECF Nos. 41-20, 41-21, 41-22.)

According to Arteta, he terminated Cowart because he did not believe Cowart possessed the "moral or ethical aptitude" required for the PIO role, and he terminated Blatt and Powell because they were untrustworthy and unqualified for the position and because of their close association with Cowart.  (Ds' 56.1 Stmt. ¶¶ 135, 161, 169, 170.)  Arteta claims that Cowart treated coworkers poorly and had been accused of engaging in various forms of misconduct, including smoking in his work vehicle, attending illegal card games where discussions about selling drugs took place, and threatening other police officers to drop criminal charges against his brother.  (*Id.* ¶¶ 140-59.)  Cowart, however, insists that his relationships with his colleagues were amicable and respectful, and while he admits that he smoked in his work vehicle before he was directed not to do so by Jones, he denies that he engaged in "any unethical, corrupt or illegal conduct."  (ECF No. 47 ("Cowart Decl.") ¶¶ 9-10, 12; Ps' 56.1 Resp. ¶¶ 140-59.)

Arteta alleges that he terminated Powell because of incompetent and dishonest conduct when the latter was with the state police and because he was hired despite being unqualified only because he was close with Cowart.  (Ds' 56.1 Stmt. ¶¶ 121-22, 137, 160-68, 170.)  Arteta alleges that he fired Blatt because he felt he had been hired only because he was Cowart's golfing buddy and showed poor character by being Cowart's toady.  (*Id.* ¶¶ 119-20, 160, 169-70.)

---

[2] Arteta first attempted to terminate Plaintiffs via a letter he sent on December 16, 2022, but Plaintiffs challenged his power to do so because he had not yet taken office.  (Ps' Counterstmt. ¶¶ 37-39; ECF No. 41-3 ("Arteta Depo.") at 143:13-144:1.)  Arteta therefore sent new letters on January 4, 2023, informing Plaintiffs that they were terminated effective January 1, 2023.  (Ps' Counterstmt. ¶ 39; ECF Nos. 41-20, 41-21, 41-22.)

Upon taking office, Arteta hired several employees whom he knew or assumed to have supported Jones in the election, including Plaintiffs' replacements.  (*Id.* ¶¶ 176-80, 190.)  After creating a second Undersheriff position for a previous Jones supporter and allowing her to notify Jones before publicly accepting the role, Arteta told her that he was "done with the politics and he was moving forward."  (*Id.* ¶¶ 181-89.)

      **B.**    <u>**Procedural History**</u>

On October 26, 2023, Plaintiffs filed their initial Complaint, asserting claims under 42 U.S.C. § 1983 and New York Labor Law § 201-d against Arteta, the OCSO and the County of Orange.  (*See* ECF No. 1 ("Compl.").)  On December 12, 2023, Defendants filed a letter requesting a conference to discuss their anticipated motion to dismiss.  (ECF No. 12.)  After the Court held a conference to discuss the potential motion, however, (*see* Minute Entry dated Jan. 10, 2024), Defendants chose instead to file an answer, (*see* ECF No. 15).

The Court then held a conference on March 14, 2024, (*see* Minute Entry dated Mar. 14, 2024), and set a discovery schedule, (*see* ECF No. 20).  Defendants filed another letter on December 27, 2024 requesting a pre-motion conference in anticipation of their motion for summary judgment.  (*See* ECF No. 28.)  After Plaintiffs filed their responsive letter, (*see* ECF No. 29), the Court held a conference on January 21, 2025, and set a briefing schedule for the motion, (*see* Minute Entry dated Jan. 21, 2025).  The instant motion followed.

**II.**    <u>**LEGAL STANDARD**</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).[3]  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255; *see Jeffreys v.*

*City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary

judgment, a court must construe the evidence in the light most favorable to the nonmoving party,

drawing all inferences in that party's favor.").  "Assessments of credibility and choices between

conflicting versions of the events are matters for the jury, not for the court on summary

judgment."  *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996).

        The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a

scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at

252.  Moreover, the non-movant "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated

speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

        "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

_____

        [3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks,
footnotes, and alterations.

documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

III.    **DISCUSSION**

Plaintiffs assert, pursuant to 42 U.S.C. § 1983, that Arteta violated their First Amendment rights by terminating them in retaliation for their support of his political opponent.  (*See generally* Compl.)  Defendants insist that Plaintiffs were terminated not because of their political affiliations, but because of their "serious professionalism and performance issues."  (ECF No. 42 ("Ds' Mem.") at 3.)  The factual question as to the reason for Plaintiffs' termination need not be resolved at this stage, because even assuming Plaintiffs were fired for their political affiliation, their positions were exempt from First Amendment protection under the *Elrod-Branti* "policymaker" exception.

A.    ***Elrod-Branti* Exception**

While the First Amendment typically protects public employees from being terminated based on their political beliefs and expression, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976), there is "an exception to this rule for policy-making and confidential employees, for whom political viewpoints are permissible employment criteria and who, accordingly, may be discharged by reason of political affiliations, political beliefs, ideological viewpoints or partisan activity," *Burkhardt v. Lindsay*, 811 F. Supp. 2d 632, 642 (E.D.N.Y. 2011); *see Elrod*, 427 U.S. at 372 ("There is . . . a need to insure that policies which the electorate has sanctioned are effectively implemented.  That interest can be fully satisfied by limiting patronage dismissals to policymaking positions."); *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 165 (E.D.N.Y. 2005) ("[A] public employee's First Amendment rights are not absolute, and may be outweighed by the vital government interest in efficiency and effective implementation of electorate-sanctioned policies.").  "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).[4]  The Second Circuit has applied the *Elrod-Branti* policymaker exception "to hold a wide variety of jobs to be exempt from First Amendment Protection, as have other federal courts . . . ." *Alberti*, 393 F. Supp. 2d at 166.[5]

---

[4] While the instant case involves support for a particular candidate rather than party affiliation, the same analysis applies.  *See Martinez v. Sanders*, 307 F. App'x 467, 468 (2d Cir. 2008) (summary order).

[5] Courts have found the following positions to fall within the exception:

> confidential secretary, County Veterans Service Agency Deputy Service Officer, Pre-Trial Release Program Coordinator, assistant city attorney, assistant county attorney, Assistant Director of Public Information for county, First Deputy Commissioner of Department of Water; Superintendent of Employment for municipal Park District, city solicitor and assistant solicitor, town Senior Citizens' Coordinator, County Deputy

In *Vezzetti v. Pellegrini*, the Second Circuit delineated eight factors to guide courts in determining whether an employee falls within the policymaker exception[6] to First Amendment protections:

> whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

22 F.3d 483, 486 (2d Cir. 1994). But these factors are not exhaustive, nor is any one dispositive. *Id.* "The proper approach is to assess all the factors in order to determine whether 'there is a rational connection between shared ideology and job performance.'" *Id.* (quoting *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988)); *see Butler v. N.Y. State Dep't of L.*, 211 F.3d 739, 744 (2d Cir. 2000) ("This list [of factors set out in *Vezzetti*] is not exhaustive, but instead serves as a guide; no one factor or group of factors is always dispositive."). Courts in this Circuit have also considered "whether the employees at issue are ones who act as advisers, who formulate plans for implementing broad goals, or whose responsibilities are either not well defined or of broad scope," *Torres v. Lalota*, 449 F. Supp. 3d 13, 21 (E.D.N.Y. 2020), as well as whether the employees were directly appointed by an elected official or had "authority to receive and transmit confidential information," *Cicchetti v. Davis*, No. 07-CV-10546, 2008 WL 619013, at *3 (S.D.N.Y. Mar. 5, 2008).

---

Parks Commissioner, and State Director of the Farmers Home Administration.

*Alberti*, 393 F. Supp. 2d at 166 (collecting cases).

[6] While the exception is "broader than one who makes policy," courts nonetheless "use 'policymaker' as a convenient shorthand for a person occupying a position calling for party loyalty within the meaning of the *Elrod* line of cases." *See Alberti*, 393 F. Supp. 2d at 165.

When conducting this analysis, courts must consider the "inherent duties" of an employee's role, such as those set out in their job description, "not what duties [they] have actually performed or whether they have been involved in policy-making decisions." *Vona v. Cnty. of Niagara*, 119 F.3d 201, 207 (2d Cir. 1997); *see Burkhardt*, 811 F. Supp. 2d at 643 ("This inquiry is informed solely by the job description and the powers of the office, including consideration of any statutory job descriptions that may exist for the position."); *Fry v. McCall*, No. 95-CV-1915, 1998 WL 770563, at *5 (S.D.N.Y. Nov. 4, 1998) ("[T]he job description, or what the employee could do, rather than job performance, or what the employee actually does, controls the analysis.").  "Finally, although the policymaker inquiry may require reference to facts in the record, the question ultimately is a legal one that may be decided by a Court on a motion for summary judgment." *Burkhardt*, 811 F. Supp. 2d at 643; *see Danahy v. Buscaglia*, 134 F.3d 1185, 1191 (2d Cir. 1998) ("[T]he policymaker question is one of law for the court," "informed solely by the job description and the powers of office.").

Plaintiffs concede that the first factor, exemption from civil service protection, favors Defendants.  (*See* ECF No. 48 ("Ps' Opp.") at 22.)  Although not dispositive, "[t]his fact is of outsized importance in the *Vezzetti* analysis . . . because New York has considered many of the same criteria for non-civil service status as does a court in determining whether a position is exempt from First Amendment protection." *Torres*, 449 F. Supp. 3d at 23; *see Bavaro v. Pataki*, 130 F.3d 46, 50 (2d Cir. 1997) ("We have emphasized that although we will not presume that positions defined as 'exempt' from civil service protection are necessarily exempt from First Amendment protection, interests of federalism and conservation of judicial resources counsel substantial deference to the state's judgment where government positions are so defined.").  Moreover, the rationale behind exempting the position from civil service protection here was that

the Sheriff should have "latitude to terminate" PIOs who "undermine the program." (Jones

Depo. at 56:22-61:20; *see* ECF No. 41-7; Ds' 56.1 Stmt. ¶¶ 21-22.) This demonstrates that, from

its creation, the PIO position was understood to be a role for which there was "a rational

connection between shared ideology and job performance." *Savage*, 850 F.2d at 68.[7]

The requirements of the PIO position demonstrate that the second factor, technical

competence or expertise, also favors Defendants. In addition to being certified as police officers,

PIOs must have "thorough knowledge" both of "the methods employed in conducting internal

investigations" and of "established police and corrections professional standards," as well as

significant experience "in an investigative capacity with a law enforcement agency as a police

officer." (PIO Job Description at 2.) While Plaintiffs argue that "the investigative experience

PIOs require is not really a type of 'technical competence,' but rather a broad proficiency that

could be brought to bear on their duties," (Ps' Opp. at 22), cases analyzing this factor make clear

that such job-related proficiencies qualify as "technical competence and expertise," *see*

*Burkhardt*, 811 F. Supp. 2d at 645 ("[E]ven if it is true that legislative aides need not possess a

particular type of technical expertise, such as a legal or other advanced degree, the fact that some

aides can – and do – possess certain types of expertise, including on procedural and budgetary

topics, indicates that technical knowledge may be considered part of the inherent duties of the

position."); *Legg v. DellaVolpe*, 228 F. Supp. 2d 51, 59 (D. Conn. 2002) (position of city director

of administrative affairs met standard of technical competence or expertise because job required

---

[7] Plaintiffs dispute Defendants' assertion that the PIO position is not a civil service position, maintaining that it is a civil service position "in the non-competitive class." (Ps' 56.1 Resp. ¶ 13.) Nonetheless, Plaintiffs do not contest that they lacked civil service protection against dismissal and concede that this factor favors Defendants. (Ps' Opp. at 22; *see also* Ps' Counterstmt. ¶¶ 37-39 (while Plaintiffs contested Arteta's authority to dismiss them before taking office, they did not dispute that he had that power once he officially assumed the role of Sheriff).)

background in policy development and implementation and had budgetary responsibilities);

*Wallikas v. Harder*, 118 F. Supp. 2d 303, 307 (N.D.N.Y. 2000) ("job description for Deputy

Sheriff Captain suggests that technical competence or expertise in the areas of, *inter alia,* law

enforcement, equipment, and criminal law, were necessary to the job").  And common sense

suggests that the sensitive area of internal investigations requires techniques and approaches

more nuanced than those generally applicable to police work.

 The third factor, whether the position involved control over others, is either neutral or

weighs slightly in favor of Plaintiffs.  As Defendants point out, (*see* Ds' Mem. at 19), the

authority to conduct investigations regarding alleged misconduct necessarily confers some

degree of control, *cf. Cicchetti v. Davis*, 607 F. Supp. 2d 575, 578 (S.D.N.Y. 2009) (Fire

Commissioner's "authority over fire-department disciplinary issues" supported finding that he

controlled others), but the PIO position does not entail any direct supervisory authority, (*see* Ps'

Counterstmt. ¶ 6; Arteta Depo. at 205:2-19).  And while Cowart had some authority over the

other PIOs in his role as technical captain, courts have not found the third factor met where the

plaintiff was "not in charge of a large group of employees."  *Gordon v. Cnty. of Rockland*, 110

F.3d 886, 890 (2d Cir. 1997); *see Morin v. Tormey*, 626 F.3d 40, 45 n.4 (2d Cir. 2010) ("[W]e

have previously weighed this factor against policymaker status where the employee was not in

charge of a large group of employees.").  Even if this factor favors Plaintiffs, however, courts

have repeatedly emphasized that a lack of supervisory authority is not dispositive.  *See Martinez*

*v. Sanders*, 307 F. App'x 467, 469 (2d Cir. 2008) (summary order); *Vona*, 119 F.3d at 209.

 The Second Circuit has "condensed the remaining *Vezzetti* factors to ask whether the

employee in question is empowered to act and speak on behalf of a policymaker, especially an

elected official."  *Butler*, 211 F.3d at 744.  The PIO position had such power.  While the Plaintiffs

may not have been empowered to "speak officially to the general public on behalf of the Sheriff's Office," (Ps' Opp. at 22), their job description indicates that they were required to speak on the Sheriff's behalf by "[i]nterview[ing] witnesses and targets of internal investigations" and "[m]aintain[ing] working relationships with Sheriff and Corrections command staff and other agencies," (PIO Job Description at 1-2).  Because PIOs would need to "reflect the views of policymakers" during these interactions, support for such views is not an unreasonable requirement for the position.  *Bavaro*, 130 F.3d at 50 (although plaintiffs were "not empowered to speak directly on behalf of an elected official," they fell within policymaker exception because they represented the State in disciplinary hearings and in their dealings with the individuals they prosecuted); *McDermott v. Pataki*, No. 95-CV-1496, 1996 WL 596570, at *3 (N.D.N.Y. Oct. 15, 1996) (although plaintiff was "personally directed not to comment on Board policy," his duty to "maintain a good working relationship within the community" and "monitor and implement board policies" demonstrated that "speaking in the name of policymakers was a duty inherent in the office").

Further, the PIO position was entrusted with "wide latitude for independent judgment" in implementing office policies.  (PIO Job Description at 1.)  Indeed, in creating the PIO position, Jones noted that the PIOs would "play[] a critical role in the implementation of any elected Sheriff's public policies regarding the operation of their Office," (ECF No. 41-7), and he testified that the PIOs must therefore show at least some support for such policies, (Ds' 56.1 Stmt. ¶ 21; Jones Depo. at 56:22-58:17).  And PIOs were tasked directly with reviewing and redrafting office policies to ensure compliance with professional standards.  (PIO Job Description at 1; Ds' 56.1 Stmt. ¶ 27.)  While Plaintiffs argue that they did not "develop policy" and merely "ensure[d] the extant policies and standards were complied with," (Ps' Opp. at 22), "an employee is not

14

immune from political firing merely because the employee stands apart from partisan politics, or is not the ultimate decisionmaker in an agency.  Rather, it is enough that the official be involved in policy, even if only as an adviser, implementer, or spokesperson."  *Alberti*, 393 F. Supp. 2d at 171; *see Elrod*, 427 U.S. at 368 ("In determining whether an employee occupies a policymaking position, consideration would also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals."); *see also McCaffrey v. Chapman*, 921 F.3d 159, 165 (4th Cir. 2019) (political affiliation was an appropriate requirement for employee "implementing the sheriff's policies and goals" because "the electorate generally chooses a candidate based on policies and goals espoused by that candidate" and "a sheriff owes a duty to the electorate to ensure that those policies are implemented").[8]  PIOs plainly advise on and implement policy, a function that would be hampered if they did not "share[ the] ideology" of the Office's leaders.  *Vezzetti*, 22 F.3d at 486.  Different chiefs may have different views, which they would want their internal investigators to share, as to what conduct is or is not acceptable on the part of their officers.

PIOs were also appointed by the Sheriff, (*see* ECF No. 41-23), supervised by the Sheriff,[9] and tasked with "complet[ing] and fil[ing] classified and confidential reports with the Sheriff,"

---

[8] While Plaintiffs argue that the nature of the PIO position "required them to look at objective facts and ignore political considerations to ascertain the truth," (Ps' Opp. at 23), this does not preclude application of the policymaker exception given the PIOs' duty to implement the policies of the Sheriff.  *Cf. McCaffrey*, 921 F.3d at 168 (acknowledging that while law enforcement duties should not "be handled in a political manner," "sheriffs do and should carry out the policies, goals and priorities on which they ran" and "must make policy-oriented decisions").

[9] Although Plaintiffs insist that they reported to the Undersheriff and rarely had direct contact with the Sheriff in performing their duties, (Ps' Opp. at 22-23), the inquiry, as discussed above, turns on the powers inherent in the position as reflected in the job description, not the powers that Plaintiffs actually exercised.  *See Vona*, 119 F.3d at 207; *Burkhardt*, 811 F. Supp. 2d at 643; *Fry*, 1998 WL 770563, at *5.

(PIO Job Description at 1), all of which weigh in favor of applying the policymaker exception, *see Hommel v. City of Long Beach*, No. 13-CV-3261, 2014 WL 1010654, at *3 (E.D.N.Y. Mar. 14, 2014) (position that "is confidential and involves close and substantial contact with policymaking officials" falls within exception); *Cicchetti*, 2008 WL 619013, at *3 ("Other indications of policymaker status include direct appointment by an elected official and authority to receive and transmit confidential information."); *Alberti*, 393 F. Supp. 2d at 170 ("[A] public employee's direct appointment by an elected official indicates policymaking or confidential status."); *Legg*, 228 F. Supp. 2d at 60 (employee who "may be privy to confidential information or sensitive opinions" fell within exception). It requires no imagination to recognize that investigations of allegations of internal misconduct are among the most sensitive and closely held matters in a law enforcement office.

Finally, the PIO job description states that a PIO must "[c]omplete[] special assignments as directed." (PIO Job Description at 2). Because "[a]n employee with responsibilities that are not well defined or are of a broad scope more likely functions in a policymaking position," *Elrod*, 427 U.S. at 368, this provision also weighs in favor of applying the exception, *see Legg*, 228 F. Supp. 2d at 60 ("The Second Circuit has instructed that public employees with responsibilities that are not well defined or are of broad scope more likely function in policy-making positions not protected from political patronage dismissals by the First Amendment's guarantee of free speech.").

The Court is thus persuaded that, taken together, the *Vezzetti* factors weigh decidedly in favor of the conclusion that the PIO role falls within the *Elrod-Branti* exception. Because the First Amendment therefore did not proscribe Plaintiffs' termination even assuming that it was politically motivated, Defendant Arteta is entitled to summary judgment.

16

B.    **Qualified Immunity**

In the alternative, even if the PIO position did not fall within the *Elrod-Branti* exception,

Arteta is entitled to qualified immunity.  "A defendant is entitled to qualified immunity if (1) the

defendant's conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known, or (2) it was objectively reasonable for the

defendant to believe that his actions were lawful at the time of the challenged act." *Brandon v.

Kinter*, 938 F.3d 21, 39 (2d Cir. 2019).  "'[C]learly established law' should not be defined 'at a

high level of generality,'" and while the court does not need to identify a case "directly on point .

. . , existing precedent must have placed the statutory or constitutional question beyond debate."

*White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Unless all reasonable officers would agree that a challenged action violates the Constitution, the

defendant is protected.  *See Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013).  Thus,

"qualified immunity 'protects all but the plainly incompetent or those who *knowingly* violate the

law.'" *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (emphasis in original) (quoting *Mullenix v.

Luna*, 577 U.S. 7, 12 (2015)).

"[E]ven if the interest asserted by the plaintiff was clearly of a type generally protected

by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the

time of the acts at issue that an exception" – such as the policymaker exception – "did not permit

those acts." *Danahy*, 134 F.3d at 1190.  Thus, where it was objectively reasonable for a public

employer to believe that an employee fell within the policymaker exception, the employer's

decision to terminate the employee on the basis of political affiliation is entitled to qualified

immunity.  *See id.*; *Lynch v. N.Y.C. Bd. of Elections*, No. 13-CV-4499, 2014 WL 5470795, at *1

(E.D.N.Y. Oct. 28, 2014); *Cicchetti v. Davis*, No. 07-CV-10546, 2009 WL 222379, at *4

(S.D.N.Y. Jan. 26, 2009).  In light of the above analysis, Arteta plainly had a reasonable basis to believe that the PIO position fell within the policymaker exception.

*Morin v. Tormey*, on which Plaintiffs rely to argue that qualified immunity should not apply, does not change my conclusion.  The allegation in that case was that a judge retaliated against a clerk of court who refused to spy on another judge who was the defendant's political rival.  *See Morin*, 626 F.3d at 42.  The court concluded that political loyalty was not "an appropriate job requirement" for the position at issue, which primarily involved "managing court operations," because – although several of the *Vezzetti* factors favored Defendants – "[n]othing in the record indicate[d] that political activity or ideology was necessary to the effective performance of [the] position."  *Id.* at 45-46.  Plaintiffs claim that *Morin* thus "clearly established that positions for which the *Vezzetti* factors tilt in a similar way as they do in this case are not policymaking positions."  (Ps' Opp. at 24.)  But the PIO position, as previously discussed, required Plaintiffs to exercise significant discretion to carry out the Sheriff's policies, as well as to advise on and draft policies themselves.  While PIOs, like the clerk in *Morin*, are prohibited from engaging in political activity on the job, (*see* ECF No. 44-6 at 6), that similarity does not suffice to make it clear to any reasonable employer that a PIO cannot be required to share his employer's policy views.[10]  The PIO position is more easily analogized to other positions – less clerical than the position of the plaintiff in *Morin* but less discretionary and confidential than the positions at issue here – that have been found to fall within the policymaker exception, such as a Deputy Sheriff, *see McEvoy v. Spencer*, 124 F.3d 92, 104-05 (2d Cir. 1997), or an investigator for a city finance committee, *see Hudson v. Burke*, 913 F.2d 427, 434 (7th Cir. 1990); *see also*

---

[10] The *Morin* court did not find it dispositive that the employee was prohibited from engaging in political activity on the job.  *See Morin*, 626 F.3d at 46.

*Danahy*, 134 F.3d at 1192 (collecting cases).  Accordingly, the decision in *Morin* – which addressed an essentially ministerial position – does not lead me to conclude that the policymaker exception should not apply here, let alone that this conclusion is "beyond debate."  *White*, 580 U.S. at 79.  In short, while it should have been clear to the judge in *Morin* that he could not require his clerk of court to get involved in political machinations directed at another judge, the landscape here is far less unambiguous.  Arteta is therefore entitled to qualified immunity, and summary judgment would be appropriate even if the Court had reached a different conclusion on the merits of Plaintiffs' First Amendment claim.

C.    ***Monell* Liability**

"To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020); *see Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

> To establish the existence of a municipal policy or custom, a plaintiff may demonstrate that his or her constitutional injuries arose from:  (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Guillen v. City of N.Y.*, 625 F. Supp. 3d 139, 162 (S.D.N.Y. 2022); *see Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 610 (S.D.N.Y. 2023).  "[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details."

*Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015). Additionally, "to prevail on a *Monell* claim, a plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Rutherford*, 698 F. Supp. 3d at 610 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Defendants argue that Plaintiffs failed to plead a *Monell* claim in their Complaint. (*See* ECF No. 50 ("Ds' Reply") at 1.) Plaintiffs counter that their inclusion of Orange County as a defendant in the case caption, combined with the fact that they sued Arteta in both "his individual *and official* capacities," sufficed to assert a *Monell* claim against the County. (Ps' Opp. at 8 (emphasis in original) (citing Compl. ¶ 7)).[11]

Plaintiffs did not explicitly set forth a municipal liability claim in their Complaint, but they were not required to do so. *Monell* does not provide the basis for a claim in itself; it is a basis on which to extend to a municipality liability for the constitutional torts of its employees. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006). Plaintiffs asserted their § 1983 claim against "all Defendants," (Compl. at 6); alleged that Arteta is "the final policymaker with respect to all matters regarding the operation and administration of the Orange County Sheriff's Office, including those regarding personnel decisions," (*id.* ¶ 7); and pleaded that the "the County of Orange . . . [is] liable for Arteta's unlawful and unconstitutional conduct," (*id.* ¶ 42).

But assuming that that sufficed to put Defendants on notice that Plaintiffs were asserting municipal liability, the dismissal of Plaintiffs' underlying First Amendment claim nonetheless dooms their *Monell* claim. Where "[P]laintiff[s] lack[] any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must

---

[11] Although the Complaint also included a claim against the OCSO, Plaintiffs now concede that that entity is not independently amenable to suit. (Ps' Opp. at 9.) The claim against the OCSO is therefore dismissed.

be dismissed as well." *Lener v. Hempstead Pub. Schs.*, 55 F. Supp. 3d 267, 283 n.14 (E.D.N.Y. 2014) (citing *Segal*, 459 F.3d at 219); *see Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408-09 (S.D.N.Y. 2009) ("Once a district court properly finds no underlying constitutional violation, its decision not to address the municipal defendant's liability under *Monell* is entirely correct."). Because Plaintiffs fell within the *Elrod-Branti* exception, as discussed above, their terminations did not offend the First Amendment, and they were not subject to any constitutional violation. Plaintiffs' *Monell* claim therefore fails as well.

### D.    New York Labor Law Claim

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that the only claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over the remaining New York Labor Law claim. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The § 1983 First Amendment claim is dismissed with prejudice and the New York Labor Law claim is dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 40), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  September 25, 2025
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.